UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

MALLORY WRENN,

    Plaintiff,

    v.

EXELON GENERATION, LLC,

    Defendant.

No. 18 C 2524

Judge Thomas M. Durkin

**MEMORANDUM OPINION AND ORDER**

Mallory Wrenn alleges that her former employer, Exelon Generation, LLC, discriminated against her based on: (1) her sex in violation of Title VII of the Civil Rights Act (Count I); and (2) her disability in violation of the Americans with Disabilities Act (Count III).[1] Defendant has moved to dismiss Count I for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). R. 49.[2] That motion is denied.

**Legal Standard**

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Berger v. Nat. Collegiate Athletic Assoc.*, 843 F.3d 285, 289 (7th Cir. 2016). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of

---

[1] The current Second Amended Complaint contains only Counts I and III. Earlier versions of the complaint contained a Count II and counts beyond Count III, *see* R. 1; R. 30, which Wrenn has omitted from the current complaint, *see* R. 38.

[2] Defendants do not seek dismissal of the ADA claim, Count III.

the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 646 (7th Cir. 2018).

## Background

### I. Wrenn Alleges a Co-Worker Stalked Her

Wrenn is a woman who worked for Exelon as a nuclear equipment operator at a nuclear power plant. R. 38 ¶ 7. John Zura is a man who also works for Exelon as a nuclear equipment operator at the same plant as Wrenn. *Id.* ¶ 8. Wrenn alleges that in February and March of 2017, Zura began texting Wrenn that he was attracted to her. *Id.* ¶ 9. Zura also "followed" and "liked" Wrenn on social media. *Id.* Wrenn contends that she told Zura multiple times that she was not interested and to leave her alone. *Id.* Undaunted, Zura approached Wrenn in the plant's parking lot and told

2

her: "I know I am making you uncomfortable, but I've been crazy about you for years." *Id.* Wrenn again told Zura to keep away from her, and Zura said he would. *Id.* Nevertheless, on March 8, 2017, Zura visited Wrenn's home to give her a bag of gifts, including wine and stuffed animals. *Id.*

Wrenn reported Zura's behavior to her union steward on March 10, 2017 because she was "extremely anxious and frightened by Zura's behavior." *Id.* ¶ 10. The union steward told Wrenn the union would try to handle the situation before involving Exelon's human resources department by telling Zura to leave Wrenn alone and moving him off of her crew. *Id.* But that same day, Zura approached Wrenn in the parking lot and asked if she was alright. *Id.* ¶ 11. Wrenn yelled at Zura to leave her alone. *Id.* ¶ 11. Five days later, the union steward told Wrenn that he reported the situation to human resources.

Through the rest of March and April, Wrenn had ongoing discussions with the union and the human resources department about her desire that she and Zura not work on the same crew. When Zura was again on Wrenn's crew on April 7, 2017, she sent an email to human resources asking why they were continuing to be assigned together. *Id.* ¶¶ 18-19. Human resources told Wrenn that they had not finished their investigation of her allegations and that they did not believe Exelon could move Zura because of his seniority. *Id.* Nevertheless, human resources told Wrenn to submit a written request that Zura be moved off her crew. *Id.*

3

On April 24, 2017, Wrenn sought a restraining order against Zura in Illinois state court. *Id.* ¶ 22. After a hearing on June 5, 2017, the court granted the request, ordering Zura to stay 200 feet away from Wrenn at all times. *Id.* ¶ 27-28.

## II.    Wrenn's Mental Health

Four days before seeking the restraining order in April, Wrenn's physician referred her for mental health treatment for her "stress and anxiety occasioned by Zura's stalking and [Exelon's] failure to take any decisive action." *Id.* ¶ 20. Then around May 18, 2017, Wrenn was diagnosed with Post-Traumatic Stress Disorder ("PTSD") and placed on anti-anxiety medication. *Id.* ¶ 24.

Wrenn's employment is subject to "fitness for duty" requirements provided in the United States Nuclear Regulatory Commission ("NRC") regulations. *Id.* ¶ 52. In accordance with these regulations, Exelon made a mandatory referral to its Employee Assistance Program ("EAP") regarding Wrenn's PTSD diagnosis. *Id.* ¶ 25. As a result, Wrenn "was put on FMLA leave and later short-term disability and would not be permitted to work until August 2017." *Id.* ¶ 26.

Wrenn also alleges that Exelon was required by the NRC regulations to report the restraining order against Zura. *Id.* ¶ 54 (citing 10 C.F.R. § 73.56(g) (requiring reporting of "any legal action(s) . . . that requires a court appearance")). Wrenn alleges on "information and belief" that Exelon did not report Zura in accordance with the regulations. *Id.* Whether or not Exelon followed the regulations with regard to Zura, Exelon did not place him on leave or fire him.

## III. Wrenn's Return from Leave and Termination

When Wrenn returned to work, she was told that it was not possible to prevent Zura from ever being at the plant when Wrenn was there. *Id.* ¶ 35. Wrenn objected, but she was only assured that there would be "very limited time that [Wrenn] and [Zura] will work together and cross paths," and that Exelon did not think that Zura would "risk a violation." *Id.* ¶ 36. Wrenn was also warned to maintain her "fitness for duty," and to "work on that" with her doctors. *Id.* ¶ 37.

On September 14, 2017, Wrenn noticed that she was scheduled to work on the same extended 12-hour shift as Zura on September 26, 2017. *Id.* ¶ 38. (The shift was extended for a certain procedure taking place at the plant. *Id.*) Wrenn complained to Exelon's "employee concerns program" and to her supervisors, but no action was taken to separate Wrenn and Zura. *Id.* ¶ 38.

On September 26, 2017, Zura participated in a meeting by speaker phone with Wrenn present. *Id.* ¶ 39. Wrenn became very upset. She alleges that "while Zura was not physically present in the room . . . . [h]earing Zura's voice in the room and realizing that he was somewhere on site—but not having any idea where—rendered [her] panicked and dumbfounded." *Id.* She alleges that she immediately "expressed her fear of Zura and her inability to focus on her work when Zura was present on site." *Id.* ¶ 40. Apparently, discussion immediately ensued among Wrenn and various Exelon officials about how Wrenn's and Zura's work schedules might be adjusted. *Id.* But Wrenn was told that the collective bargaining agreement "did not allow for Zura

5

to be forced to the night shift," as Wrenn requested. *Id*. Wrenn's complaint describes the ultimate resolution of that meeting as follows:

> [Wrenn] excused herself from that meeting and went to the bathroom. [The union steward] escorted her to see Exelon nurses Carol Pifken and Evan Davis. [Wrenn's] blood pressure and pulse were elevated, her heart was racing, she could not breathe and her hands were very sweaty. [Wrenn] explained her PTSD and her reaction to hearing Zura. Pifken acknowledged that hearing Zura's voice probably made [Wrenn] feel like he was right there. Davis went to call [Wrenn's] counselor, while Pifken told [Wrenn] she wasn't in any shape to be at work and sent her home. Davis returned and told Mallory that they were administratively "zeroing" her badge until there was "a plan." Mallory has been certified off work since that day.

*Id.* ¶ 41.

## Analysis

In order "to prevent dismissal under Rule 12(b)(6), a complaint alleging sex discrimination need only aver that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of her sex." *Tate v. SCR Med. Transp.*, 809 F.3d 343, 346 (7th Cir. 2015); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008). Here, Wrenn alleges that Exelon failed to adequately address Zura's conduct towards her, which caused her emotional and physical distress, which Exelon then failed to properly accommodate, which then led to investigation of Wrenn's emotional and mental state, and eventually her termination for failure to maintain a security clearance under NRC regulations. Of course, termination and the steps taken to accomplish it are unquestionably adverse actions. Wrenn alleges that Exelon took these actions, rather than actions more favorable to her and possibly less

6

favorable to Zura, because she is a woman and Zura is a man. That is all Wrenn needs to allege at the pleading stage to state a claim for sex discrimination in violation of Title VII.

Exelon's arguments to the contrary all rest on authority that a plaintiff fired for failure to satisfy security clearance regulations is barred from bringing a discrimination lawsuit, because security clearance determinations are within the sole discretion of the Executive Branch. *See Whitney v. Carter*, 628 Fed. App'x 446, 447 (7th Cir. 2016) ("Under *Egan,* we cannot review [the plaintiff's] employment-discrimination claim. Doing so would violate the requirement of judicial deference to the broad discretion of an agency that bears responsibility for the protection of classified information committed to its custody, including determining who may have access to it. To examine a claim that an agency's eligibility decision was improperly motivated, a court would have to review the actual reason for the decision, which *Egan* forbids." (citing *Dep't of Navy v. Egan*, 484 U.S. 518 (1988))).[3] Exelon frames this argument in various ways: (1) Wrenn is not similarly situated to Zura because she couldn't comply with NRC regulations; (2) Wrenn's termination is not an adverse action because it was justified by her failure to comply with NRC regulations; and (3) Wrenn's claim requires an impermissible review of her termination in

---

[3] Several district courts have applied *Egan* to fitness for duty decisions under NRC regulations. *See, e.g., Moore v. Exelon Generation Co., LLC*, 2012 WL 5304202, at *4 (N.D. Ill. Oct. 25, 2012); *Coppett v. Tennessee Valley Auth.*, 987 F. Supp. 2d 1264, 1274 (N.D. Ala. 2013).

7

accordance with NRC regulations. But at bottom, all three of these arguments rest on the contention that the decision to terminate Wrenn is not reviewable.

Exelon may be correct that *Egan* will ultimately require dismissal of Wrenn's Title VII claim. Federal courts appear to agree that *Egan* requires dismissal of any claim that ultimately requires review of a security clearance determination. But some courts have held that *Egan* does not bar claims alleging that a private employer "used the government's security clearance decision as a pretext for terminating [the plaintiff] in a discriminatory fashion." *Zeinali v. Raytheon Co.*, 636 F.3d 544, 552 (9th Cir. 2011); *see also Rattigan v. Holder*, 689 F.3d 764, 771 (D.C. Cir. 2012) ("[W]e hold that [the plaintiff's] Title VII claim may proceed only if he can show that agency employees acted with a retaliatory or discriminatory motive in reporting or referring information that they knew to be false."); *Makky v. Chertoff*, 541 F.3d 205, 213 (3d Cir. 2008) ("[W]e conclude that we have jurisdiction to review [the plaintiff's] claim of discrimination because a discrimination claim under a mixed-motive [or pretext] theory does not necessarily require consideration of the merits of a security clearance decision."); *Moore*, 2012 WL 5304202, at *4 ("The Court certainly can make the determination that the national security criteria are not being applied uniformly without having to delve into whether the criteria are over restrictive, for example. Thus, the Court believes that it is too early to dismiss Plaintiff's case."); *Gautney v. Tennessee Valley Auth. Bd. of Directors*, 9 F. Supp. 3d 1245, 1252 (N.D. Ala. 2014) ("[E]mployers cannot enforce position requirements selectively and cannot evade Title VII simply because a requirement involves national security."); *but see Perez v.*

*F.B.I.*, 71 F.3d 513, 514-15 (5th Cir. 1995) ("Because the court would have to examine the legitimacy and the possibly pretextual nature of the FBI's proffered reasons for revoking the employee's security clearance, any Title VII challenge to the revocation would of necessity require some judicial scrutiny of the merits of the revocation decision. As the Supreme Court and several circuit courts have held that such scrutiny is an impermissible intrusion by the Judicial Branch into the authority of the Executive Branch over matters of national security, neither we nor the district court have jurisdiction to consider those matters."). Exelon's brief does not address this exception. Rather, Exelon's arguments focus on Wrenn's apparent concession she is no longer fit for security clearance. *See* R. 63 at 8 (Wrenn states in her brief that she has not "alleged that [Exelon's] decision to withdraw her unescorted access privileges was in error."). But she does not seek reinstatement, and to the extent Exelon contributed to the development of Wrenn's unfitness, or Exelon enforced the relevant regulations in a discriminatory manner to Wrenn's detriment, she has stated a claim for damages. (The facts might reveal further scenarios in which Exelon could be liable.) Discovery is necessary to test these claims. Indeed, district courts that have dismissed claims based on *Egan* have generally done so at summary judgment. *See*, *e.g.*, *Coppett*, 987 F. Supp. 2d at 1274.

In *Whitney*, however, the Seventh Circuit held that *Egan* bars even a claim that "an agency's eligibility decision was improperly motivated," because "a court would have to review the actual reason for the decision, which *Egan* forbids." 628 Fed. App'x at 447. But that case concerned a claim against the Secretary of Defense, not a

9

private employer like Exelon. Some courts have limited *Egan's* scope to cases in which the "private employer [can be said to be] *responsible* for the executive's security clearance decision." *Zeinali*, 636 F.3d at 550; *see also Beattie v. Boeing Co.*, 43 F.3d 559, 566 (10th Cir. 1994) (suit against private employer barred by *Egan* because the executive branch "delegated" authority over security clearance decisions to the employer); *Johnson v. Sw. Research Inst.*, 384 F. Supp. 3d 722, 731 (W.D. Tex. 2019) ("Here, the decision of whether to grant, deny, or rescind [the plaintiff's] clearance was never delegated to [the private employer]—this authority was always maintained by the Executive Branch."). In other words, *Egan* does not bar discrimination lawsuits against private employers that have not been delegated authority over security clearance decisions. Exelon is a private company, but it does not address this authority discussing how *Egan* applies to it. Moreover, the complaint is an insufficient basis to determine Exelon's relationship with the NRC and whether Exelon's decisions can be attributed to the government. Discovery is necessary on that issue as well.

## Conclusion

Therefore, Exelon's motion to dismiss [49] is denied.

ENTERED:

*Thomas M Durkin*
_____
Honorable Thomas M. Durkin
United States District Judge

Dated: November 22, 2019

10