# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| Mallory Wrenn, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:18-cv-02524 |
| v. | ) | |
| | ) | Honorable Iain D. Johnston |
| Exelon Generation LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Mallory Wrenn alleges that her former employer, Exelon Generation LLC, unlawfully discriminated against her based on her sex and disability, violating Title VII of the Civil Rights Act (Count I) and the Americans with Disabilities Act (Count III), respectively. Defendant has moved for summary judgment on both counts. Dkt. 93. And Plaintiff Wrenn has moved to strike the declaration of Kyle Kramer. Dkt. 102. For the reasons stated herein, Plaintiff's motion to strike is denied, and Defendant's motion for summary judgment on both counts is granted.

## BACKGROUND

As a preliminary matter, Local Rule 56.1 requires a party seeking summary judgment to file an accompanying statement of facts, with numbered paragraphs and citations to the record supporting those facts. *See* LR 56.1(a) (the pre-December 1, 2020, rule, in effect during briefing). The party opposing summary judgment must then file "a concise response to the movant's statement that shall contain . . . a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." *See* LR 56.1(b)(3) (the pre-

December 1, 2020, version). The consequence of failing to do so is dire: "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." *Id.* The Court expects strict compliance. *See Ammons v. Aramark Uniform Servs., Inc.* 368 F.3d 809, 817 (7th Cir. 2004). In addition, the party opposing summary judgment must file its own statement with numbered paragraphs to assert any additional facts that require the denial of summary judgment, and the movant may then file a response. *See* LR 56.1(a). The movant's failure to controvert the opposing party's statements will likewise result in the admission of those facts. *Id.*

Here, the plaintiff filed no response to defendant's numbered statement of facts. The mechanics of Local Rule 56.1 "promote the clarity of summary judgment findings." *Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011). The unnecessarily burdensome alternative is for the Court to scour through the record and determine for itself whether any of the facts asserted by the plaintiff raise material questions of fact when compared to any of the defendant's statements of fact, an exercise in which it need not engage on behalf of a party who made no effort to do so itself. *See Thornton v. M7 Aerospace LP*, 796 F.3d 757, 769 (7th Cir. 2015). Accordingly, for purposes of resolving the motion for summary judgment, the defendant's well-supported statements of fact are all deemed admitted, as are the undisputed statements of fact from the plaintiff's statement of additional facts. *See* dkts. 94, 107.

## A. Wrenn and Zura are Nuclear Equipment Operators

Mallory Wrenn, a female, was employed as a nuclear equipment operator for Exelon Generation LLC ("ExGen") at its Byron Nuclear Generating Station ("Byron Station") from January 2011 through March 2019. Dkt. 94, ¶¶ 1, 4, 76. Equipment operators and other employees at Byron Station were represented by Local 15, International Brotherhood of

Electrical Workers ("the Union"), which had a collective bargaining agreement ("CBA") in place with ExGen. *Id.* ¶ 5. At the beginning of 2017, Wrenn was on the same crew as John Zura, a male, who was also employed as a nuclear equipment operator at Byron Station and had been for over thirty years. *Id.* ¶ 10. Wrenn considered Zura a "work buddy" and they occasionally socialized outside work. *Id.* Zura had been to Wrenn's home a few times, including a holiday party where he drank too much and ended up spending the night on Wrenn's sofa. *Id.* At the time, Wrenn was 31 years old and Zura was 56 years old. *Id.* ¶ 11.

### B. Unwelcome Attention and Stalking

On February 19, 2017, Wrenn and Zura met a fellow coworker at a local bar for drinks after work. *Id.* ¶ 12. Later that evening, Zura sent text messages to Wrenn saying that he liked how she looked in her jeans and calling her "sexy" and "beautiful." *Id.* The next morning, on February 20, he texted her that he woke up with a smile on his face. *Id.* The following day, February 21, 2017, Zura again texted Wrenn, explaining that he had liked her for a long time but knew there was a "one in one hundred million chance" that she would be interested in him, given the age difference. *Id.* ¶ 13. Wrenn responded by blocking Zura on her social media accounts. *Id.* But Wrenn did not block Zura's texts. On February 25, Zura texted Wrenn that he thought she was "an amazing woman" and that his broken heart was returning to normal. *Id.* ¶14. The next day, Wrenn replied, telling Zura that he was making her uncomfortable, she had no feelings for him, and that he needed to leave her alone. *Id.* ¶ 15. Zura apologized and did not text Wrenn again. *Id.*

A week later, on March 5, 2017, Zura unwisely stopped Wrenn in the parking lot during shift change, explaining that he knew it made her uncomfortable, but he had "been crazy about" her for years. *Id.* ¶ 16. Wrenn again asked him to leave her alone. *Id.* But he didn't. On March 8,

2017, Zura showed up at Wrenn's home with a gift bag containing two bottles of wine, chocolates, a stuffed animal, and a $50 gift card, telling Wrenn it would make him feel better if she took the gifts. *Id.* ¶ 17. He included a card that read, "I hope this is a start to repair the damage to our friendship that I caused. Still sorry and will always be sorry." *Id.* Wrenn refused the gifts and told him to leave her alone; Zura left the gift bag on her doorstep and left. *Id.* On March 10, 2017, Wrenn reported Zura's conduct to her Union stewards, who agreed to speak with Zura. *Id.* ¶ 18. Later that evening, Zura approached Wrenn in the parking lot and asked if she was okay, but Wrenn yelled at Zura to leave her alone. *Id.* Finally getting the point, that was the last time Zura communicated with Wrenn. *Id.* ¶ 19.

On March 16, 2017, the Union stewards contacted ExGen's Human Resources ("HR") regarding Zura's conduct towards Wrenn. *Id.* ¶ 21. HR contacted Wrenn, but Wrenn had expressed that she wanted to "think things over" first. *Id.* On March 20, Wrenn finally met with HR and Mr. Kissinger, a representative from Corporate Investigations and Security Services who interviewed Wrenn about her concerns. *Id.* ¶ 22. Wrenn provided her text messages with Zura and a chronology of events between February 19 and March 10 to Kissinger. *Id.* On March 30, 2017, Kissinger and HR spoke with Zura regarding his conduct towards Wrenn.

On April 7, 2017, Wrenn and Zura were assigned to the same shift, and they both ended up in the break room at the same time. *Id.* ¶ 24. Zura followed Wrenn into the locker room, then into the kitchen, and then he selected a seat directly across from her during the shift briefing. *Id.* They did not speak to one another. *Id.* Later that day, Wrenn became ill and went home sick. *Id.* ¶ 25. That afternoon, she spoke with HR on the phone and asked if Zura could be moved to another crew, and HR advised her to put her request in writing. *Id.* ¶ 26. After calling off sick, Wrenn remained continuously on a medical leave of absence until August 2017. *Id.* ¶ 27. On

April 12, Wrenn emailed HR and asked that Zura be moved to a different crew. *Id.* ¶ 28. On or about April 24, 2017, Wrenn filed a petition ex parte for an Emergency Stalking No Contact Order ("SNCO") against Zura.

On April 25, the Union notified ExGen that Zura agreed to move to a different crew. *Id.* ¶ 29. Also, on that same day, ExGen management issued Zura a written reprimand for his conduct in violation of ExGen's policy against harassment and a warning that further violations would "result in additional discipline up to and including discharge." *Id.* ¶ 30. On April 27, 2017, in accordance with regulations, Zura notified ExGen of the ex parte Emergency SNCO Wrenn obtained against him. *Id.* ¶ 31. After a full hearing in June 2017, the court granted Wrenn a two-year plenary SNCO requiring Zura to stay at least 200 feet away from Wrenn, including at Byron Station, and that if there were "incidental meetings at work," it was Zura's responsibility to remove himself from her presence. Dkt. 99, ¶ 2. Zura never violated the SNCO. Dkt. 94, ¶ 32.

### C. No-Contact Order and Its Effects

In May 2017, while on medical leave, Wrenn was diagnosed with post-traumatic stress disorder ("PTSD") caused by multiple factors, including Zura's recent conduct, and she was prescribed medications to treat this condition. *Id.* ¶ 33. When she received this diagnosis, she notified Nurse Pifken in ExGen's Occupational Health and Services Department ("OHS"). *Id.* ¶ 34. This diagnosis made Wrenn eligible to receive disability benefits of approximately 80 percent of her base pay during medical leave. *Id.* Although Wrenn disclosed her diagnosis to ExGen OHS, she did not allow the information to be shared with HR—the former maintained employee health records confidentially. *Id.* ¶ 35; dkt. 94-6, at 4, 14-17; dkt. 106, at 8 (noting that Wrenn's health disclosure form specifically prohibits disclosure to HR). Wrenn only permitted disclosure to the Access Authorization and Fitness for Duty Medical Review Officer and Nurse

Pifken, the site nurse. *Id.* Although HR was aware that Wrenn was on medical leave, they were not aware of Wrenn's PTSD diagnosis or subsequent treatment. *Id.*

Because of the concerns Wrenn raised about Zura's conduct, including her obtaining the SNCO against him, from April 28 through May 4, 2017, HR and management worked to ensure Zura would not come into contact with Wrenn when she returned. Dkt. 94, ¶¶ 36-7. Although ExGen moved Zura to a different shift, HR issued memos identifying situations when their schedules could potentially overlap. *Id.* To avoid contact during these situations, ExGen laid out special procedures that Zura would follow when arriving and leaving work, during shift turnover, during training weeks, and concerning overtime. *Id.* ¶ 37. Additionally, Zura agreed to not accept overtime on Wrenn's shift if he were offered it. *Id.* ExGen reported these procedures to the Union "to ensure that the restraining order was followed and Ms. Wrenn was protected." *Id.* The Union responded by threatening to file a grievance if Zura's rights under the CBA were violated. *Id.* ¶ 38. Also around this time, ExGen worked with the Union to explore whether Zura could be transferred to a different nuclear facility, but Zura did not want to transfer because the nearest facility was over two hours from Zura's home and the transfer would cause him to lose his seniority rights. *Id.* ¶ 39.

Before she was scheduled to return to work, Wrenn exchanged emails with HR, inquiring what measures ExGen planned to take in response to the SNCO. *Id.* ¶ 40. On August 11, 2017, HR circulated an email among five shift managers regarding Wrenn's return and the procedures to keep them separate, including when their shifts would overlap once every five weeks, if Wrenn accepted overtime on Zura's crew, and if Wrenn's crew was training while Zura was onsite. *Id.*; dkt. 107 ¶¶ 9-11. For example, during the overlap once every five weeks, Zura was required to turnover at an alternate location and leave the premises once Wrenn was in the break

room. Dkt. 94, ¶ 40. Additionally, the August 11 email indicated that Wrenn had selected the same day shift as Zura during the upcoming "outage" period, and that further discussions would be needed. *Id.* ¶ 41. Employees selected either the day or night shift during the outage, based on their seniority; those with the most seniority selected first, and each subsequent employee could see what shifts the previous, senior employees chose. Dkt. 106, ¶ 5. Wrenn selected the day shift for the upcoming outage, knowing Zura had already chosen that same shift. Dkt. 94, ¶ 41. HR, management, and the Union stewards met to discuss this situation, and they asked Zura if he would switch to the night shift to avoid contact with Wrenn. *Id.* ¶ 42. Zura refused because he always worked the day shift during the outage—and because he refused to waive his seniority rights under the CBA which permitted him to choose first. *Id.* Wrenn testified that "she picked the day shift because she preferred the day shift over the night shift." *Id.* ¶ 43. However, during six of the last seven outages between 2012 and 2017, Wrenn chose to work the night shift. (She chose the day shift once, in 2015.) *Id.* Zura, on the other hand, consistently chose the day shift during all of those last seven outages. *Id.*

### D. Wrenn Returns to Work in August 2017

On August 16, 2017, Wrenn returned to work following her medical leave. *Id.* ¶ 44. She met with HR, who informed her that "steps were taken" to ensure Zura complied with the SNCO and would be separated from her. *Id.* Additionally, HR informed her that Zura was now on a different crew (during non-outage periods) and was being "performance managed." *Id.* Wrenn was concerned, and when HR asked what she needed, Wrenn replied, "when I'm here, he's not." *Id.* ¶ 45; dkt. 107, ¶ 19. On August 23, HR again met with Wrenn to discuss the SNCO and explained that it believed that there would be a very limited amount of time when Zura was on property at the same time as Wrenn and the chance of Zura ever getting within distance where a

violation of the order could happen was minimal. Dkt. 94, ¶ 46. HR also advised Wrenn that if she believed that Zura should never be at Byron Station at the same time as her, she should speak to her lawyer about having the SNCO modified. *Id.* ¶ 48. Wrenn never sought any modification of the SNCO through the courts. *Id.* ¶ 49. The next day, Wrenn emailed HR, asking for details about what would happen if the two crossed paths; HR replied on August 30, 2017, stating that "arrangements have been made" and that there would be a "very limited amount of time" when they would be on the property together. *Id.* ¶ 50. HR also asked Wrenn if there were any additional facts not brought to ExGen's attention that had her so concerned about Zura's conduct. *Id.* ¶ 51. The only additional fact Wrenn provided in response was the details of the April 7 incident when she saw Zura and he sat across from her. *Id.* ¶ 52. Wrenn did not disclose her PTSD diagnosis and treatment to HR at this time.

On September 5, 2017, HR provided an email update to Wrenn concerning the shift turnover arrangements during the outage period, specifically, that Zura would do his turnover and job briefing from the Training Building, then report to the Fix It Now area, while Wrenn would report to the equipment operator break room with the other crew members. *Id.* ¶¶ 53-4. Wrenn took issue with this plan because she kept a locker near the Fix It Now area, and she met with ExGen management and Employee Concerns to discuss. *Id.* ¶ 55. In response, ExGen assigned Zura as an "outside operator"[1] after the briefing and perform outside rounds, instead of reporting to the Fix It Now area as originally planned. *Id.* ¶ 56. On September 25, 2017, the day before the outage period started, HR met with Zura and confirmed the arrangements over email,

---

[1] At the 1,782-acre Byron Station nuclear site, the main Turbine Building, where Wrenn and others regularly report for work, is inside the "protected area." The Training Building, where Zura was assigned to report during the outage, is outside the protected area and across the parking lot, over 1,400 feet away. "Outside operators" work outside the protected area, checking equipment in other buildings and locations on site. Dkt. 94, ¶ 58.

specifically warning Zura that his job would be at risk if he violated the SNCO or any ExGen policies. *Id.* ¶ 59. ExGen's work schedule, which listed Wrenn assigned to a job inside the protected area and Zura to outside rounds, was clearly posted and accessible via computers. *Id.* ¶ 60.

### E. Shift Turnover on September 26, 2017

On September 26, 2017, Wrenn and Zura reported to their respective locations for the job briefing. *Id.* ¶ 61. Job briefings happen during shift turnover; each member of the crew participates and reports on his or her planned work for the day. *Id.* ¶ 54. This briefing was conducted using a conference call to allow Zura to participate remotely. *Id.* ¶ 61. When it was his turn, he spoke briefly to provide his update. *Id.* Following the briefing, Wrenn asked to speak with the shift manager and explained to him that she had an SNCO against Zura and was experiencing a panic attack because she did not know where he was when she heard his voice during the briefing.[2] *Id.* ¶ 62. Next, Wrenn met with HR and explained that Zura's presence was a distraction and that she did not feel safe. *Id.* ¶ 63. After this meeting, she began crying and became very upset; HR accompanied her to the site nurse, who found that Wrenn's blood pressure was elevated and that she was in no shape to be working. *Id.* ¶ 65. Wrenn told Nurse Pifken about her PTSD and reaction to hearing Zura's voice, and ExGen's nursing staff made a mandatory Employee Assistance Program ("EAP") referral with a diagnosis of "emotional symptoms." Def.'s Amended Answer to Second Amended Complaint, Dkt. 80, ¶ 41. ExGen also "zeroed" her badge, revoking her access authorization to the site until further notice. *Id.* Wrenn went home and never returned to Byron Station. Dkt. 94, ¶¶ 65-6, 75.

---

[2] It is undisputed that HR informed Wrenn via email on September 5, 2017, that Zura would turnover in the Training Building during the outage. *See* dkt. 94, ¶ 53 (citing Exhibit A, Wrenn Dep. at 145-147 and Dep. Ex. 20).

The following day, September 27, 2017, Wrenn began a sixty-five-week medical leave, collecting disability benefits at approximately eighty percent of her base pay. *Id.* ¶ 66. She remained on leave for the maximum allotted time, through December 26, 2018. *Id.* Wrenn did not believe she could be fit for duty if she knew Zura was on the site, so she never contacted ExGen about returning to work. *Id.* ¶¶ 66-7. ExGen did not reach out to Wrenn until April 9, 2018, the day they received her legal complaint. *Id.* ¶ 71.

## F. Wrenn Takes Legal Action

On December 29, 2017, Wrenn filed a charge of sex discrimination with the Equal Employment Opportunity Commission ("EEOC"). Dkt. 93, ¶ 63. On January 11, 2018, the EEOC provided Wrenn with a dismissal and right to sue letter. *Id.* ¶ 64. On March 8, 2018, Wrenn filed a charge of disability discrimination with the EEOC. *Id.* ¶ 76. On April 16, 2018, the EEOC provided Wrenn with a dismissal and right to sue letter in that matter. *Id.* ¶ 77.

On April 9, 2018, Wrenn filed her initial complaint against ExGen and Zura in federal court, alleging sex discrimination, retaliation, disability discrimination and intentional infliction of emotional distress against ExGen and intrusion upon seclusion and intentional infliction of emotional distress against Zura. Dkt. 94, ¶ 69; *see* dkt. 1. Only the sex and disability discrimination claims against ExGen have survived to this point. *See* dkt. 38.[3] For both Title VII sex discrimination and ADA disability discrimination, Wrenn seeks full front pay; full back pay; lost benefits; compensatory damages; punitive damages; attorneys' fees, costs, and expenses; and a jury trial on all matters. Dkt. 38, ¶¶ 68, 81.

---

[3] Judge Kapala previously granted ExGen's motion to dismiss the hostile work environment claim. Dkt. 37. Although Judge Kapala allowed Wrenn leave to replead this claim against ExGen, dkt. 37, at 8, 14, she did not.

As a result of the lawsuit against him, Zura became depressed and reported it to HR; they sent him home, revoked his access authorization, and made a referral to the EAP. Dkt. 94, ¶ 70. Zura was on medical leave until August 7, 2018, when the Medical Review Officer for Access Authorization and the Fitness for Duty Program deemed him fit to return. *Id.*

Also on April 9, HR reached out to Wrenn and asked what kind of reasonable accommodation she needed, but Wrenn did not respond. *Id.* ¶ 71.

On October 15, 2018, HR sent Wrenn a letter informing her that her benefits would expire December 26, 2018, and explaining that ExGen's options with respect to Zura were limited because of the CBA with the Union but that they wanted her cooperation in the "interactive process." *Id.* ¶ 72. Wrenn did not respond. *Id.*

On November 13, 2018, HR reached out to Wrenn, again reminding her about her disability benefits and informing her that Zura would be retiring by December 6, 2018. *Id.* ¶ 73. HR invited Wrenn to return to work, offered to consider reasonable accommodations, and made arrangements with Byron Station's Access Authorization Department for Wrenn to return the week of December 10. *Id.* Wrenn did not respond. *Id.*

On December 17, 2018, after Wrenn did not report to work the week of December 10, ExGen reached out to Wrenn, reminding her about the expiring disability benefits and providing her information about supplemental benefits for completely disabled employees. *Id.* ¶ 74.

On December 21, 2018, after speaking with Wrenn via telephone, HR emailed her with information about the supplemental plan and reiterating that Zura no longer had access to the

---

[4] The Court notes that the following, taken from Defendant's Rule 56.1(a)(3) Statement of Undisputed Material Facts, occurred after this lawsuit was filed. *See* dkt. 1. The undisputed fact is that ExGen was unaware of Wrenn's PTSD diagnosis until it received the complaint filed in federal court.

site. *Id.* ¶ 75. As HR previously informed Wrenn, Zura had retired by then. Wrenn did not respond. *Id.* Despite Wrenn's demand that Zura not be at work when she was present, even though Zura retired, according to Wrenn there was nothing ExGen could do to get her to return to work. *Id*. ¶ 77.

On December 26, 2018, Wrenn's medical leave and disability benefits expired because she reached the maximum allotment of sixty-five weeks. *Id.* ¶ 76. Wrenn did not apply for supplemental benefits. *Id.* ¶ 75.

In December 2018, Wrenn stopped seeing her psychiatrist and stopped taking medication for her PTSD. *Id.* ¶ 78.

In January 2019, Wrenn began a new job as a Purchasing Agent at Deatak. *Id.* Wrenn did not respond to ExGen; in fact, she expected to be terminated in accordance with the terms of her disability benefit program. *Id.* ¶ 76.

On March 1, 2019, ExGen formally terminated Wrenn, explaining in a letter that she was being terminated "because you have exhausted your approved medical leave, have no further leave available, and did not return to work with or without a reasonable accommodation." *Id.* Wrenn never suggested an accommodation other than a guarantee that Zura was not present when she was. *Id.*

The parties have completed discovery, and ExGen moved for summary judgment on both claims. Dkt. 93.

## LEGAL STANDARD

On summary judgment, the Court must construe the "evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). The movant has the burden of showing

that "no genuine dispute as to any material fact" exists and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine dispute of material fact exists if, when viewing the record and all reasonable inferences drawn from it in the light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Beardsall, v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020). If the movant meets this burden, to survive summary judgment the non-movant must set forth specific facts to show that there is a genuine dispute of fact for trial. *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 2021 U.S. App. LEXIS 11366 *16, 994 F.3d 869 (7th Cir. 2021) (citing *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) ("As the put up or shut up moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial.")). "Summary judgment is only warranted if . . . [the court] determine[s] that no jury could reasonably find in the nonmoving party's favor." *Blasius v. Angel Auto, Inc.*, 839 F.3d 639, 644 (7th Cir. 2016).

## ANALYSIS

The Court has struggled with the summary judgment motion because the parties never fully engaged with each other's arguments. Moreover, at times, the arguments not only for but also against summary judgment were difficult to track. Parties are certainly entitled to frame issues and litigate cases how they choose. But when they fail to precisely articulate or directly address arguments, the process becomes unnecessarily complicated. The Court has done its level best to identify, understand, and address the relevant arguments.

\*     \*     \*

## A. ADA Failure to Provide Reasonable Accommodation

Wrenn alleges that ExGen discriminated against her based on her disability when it failed to provide her with a reasonable accommodation for her disability under the ADA. ExGen argues that it is entitled to summary judgment on the ADA claim for four reasons: (a) Wrenn was not disabled within the meaning of the ADA; (b) Wrenn's request that ExGen violate Zura's CBA seniority rights was unreasonable; (c) Wrenn did not need an accommodation to perform the essential functions of her job; and (d) Wrenn rejected ExGen's reasonable accommodation. For the reasons below, ExGen's summary judgment motion as to the ADA claim is granted.

The ADA requires that employers make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A). To establish a *prima facie* case of failure to accommodate pursuant to the ADA, plaintiffs must show the following: (1) they are a qualified individual with a disability; (2) the employer was aware of their disability; and (3) the employer failed to reasonably accommodate the disability. *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747-48 (7th Cir. 2011).

### 1. *Employer awareness of a disability*

Employers are only required to accommodate "known" disabilities, and "a plaintiff must normally request an accommodation *before* liability under the ADA attaches." *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 608 (7th Cir. 2012) (emphasis added). Although this rule is not without exception, *see Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000), "once the employer has been put on notice, the employer must take reasonable steps to accommodate the employee's disability." *Cloe v. City of Indianapolis*, 712 F.3d 1171,

1176 (7th Cir. 2013). When there is a qualified individual with a disability[5], the next step in the analysis is whether the employer had notice of the individual employee's disability. "[A]n employer cannot be liable under the ADA . . . when it indisputably had no knowledge of the disability." *Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995). "Absent special circumstances, like a severe cognitive disability or mental illness, the employee's initial duty requires that he or she 'indicate to the employer that she has a disability and desires an accommodation,'" *Cloe*, 712 F.3d at 1178 (quoting *Sears*, 417 F.3d at 803). The Seventh Circuit has "consistently held that disabled employees must make their employers aware of any nonobvious, medically necessary accommodations with corroborating evidence such as a doctor's note or at least orally relaying a statement from a doctor" before the employer's duty to provide an accommodation is triggered. *Ekstrand v. Sch. Dist. of Somerset*, 583 F.3d 972, 976 (7th Cir. 2009).

In *Cloe*, a disabled employee told her employer that she was having trouble walking, then three months later, she submitted a doctor's note and specifically asked for an accommodation for her disability. *Cloe*, 712 F.3d at 1178. The court found that "the accommodation process" began when she submitted the doctor's note and formally requested the accommodation—not earlier, when she told them she was having trouble walking. *Id.* Here, Wrenn admittedly never reported her PTSD diagnosis to her employer. Although ExGen's Medical Review Officer and OHS site nurse were made aware of the diagnosis, they operate "on a confidential basis" and do not disclose employee health-related information with HR unless the employee expressly signs an authorization permitting disclosure. Wrenn signed such authorization; however, she

---

[5] The Court states no opinion as to whether Wrenn is a qualified individual with a disability because the outcome of this lawsuit would be the same either way. It is noted, however, that ExGen argues Wrenn is not disabled because her PTSD did not "substantially limit" a major life activity, then later argues that they provided a reasonable accommodation anyway. Dkt. 95, ¶ 7.

specifically marked the authorization form *to prohibit any disclosure to HR*. Dkt. 94, ¶ 35.
Wrenn's psychiatrist also submitted monthly statements to ExGen so that Wrenn could remain
eligible for leave, but the only reasonable inference is that these doctor's notes were sent to the
Medical Review Officer and OHS, not to HR. Dkt. 94, ¶ 68. HR employees testified that they
learned of Wrenn's PTSD diagnosis and need for ADA accommodation when they read the
Complaint filed on April 9, 2018. *Id.* ¶ 69 (citing Soderquist Dep., at 172, 185, 216; Welt Dep.,
at 108).

ExGen argues that Wrenn not only failed to give notice of her disability, but also
"actively concealed her condition." Dkt. 106, at 8. For this, ExGen relies on the signed form
precluding disclosure to HR and her failure to mention her PTSD in any of the meetings with HR
before her lawsuit was filed in April 2018. Because the movant on summary judgment need only
show that there is "an absence of evidence to support the nonmoving party's case," ExGen has
met its burden of production. *Modrowski v. Pigatto*, 713 F.3d 1166, 1168 (7th Cir. 2013)
(quoting *Celotex*, 477 U.S. at 325). Wrenn, on the other hand, has not met her burden of
persuasion, for she has not offered any evidence that she notified ExGen of her PTSD before
filing the lawsuit—or in the alternative, that ExGen should have known. Wrenn did not respond
to ExGen's Local Rule 56.1 Statement of Facts denying that ExGen found out about her
disability on the day the lawsuit was filed, nor did she allege any such facts in her Statement of
Additional Facts. In fact, Wrenn states, in response to the motion for summary judgment, that
she "never requested an accommodation from ExGen before her meeting with [HR] . . . on
August 16, 2017." Dkt. 101, at 10. Not only is this improperly asserted through a response, but it
also refers to her stalking concerns discussed with HR on August 16, not her disability.

For these reasons, Wrenn cannot establish a *prima facie* case of discrimination because she failed to show that ExGen had notice of her disability.

### 2. Reasonable accommodations

An employer's duty to reasonably accommodate a disabled worker is met "when the employer does what is necessary to enable the disabled worker to work in reasonable comfort." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 803 (7th Cir. 2005). "Once an employer's responsibility to provide reasonable accommodation is triggered, the employer must engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *Haschmann v. Time Warner Ent. Co.*, 151 F.3d 591, 601 (7th Cir. 1998) (citing *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir.1996)). Assuming *arguendo* that Wrenn could establish the first two elements in a failure to accommodate analysis—namely, that she was a qualified individual with a disability and that ExGen was aware of her disability—the facts, viewed in the light most favorable to Wrenn, do not establish that ExGen failed to accommodate her disability.[6]

Here, ExGen's responsibility was not triggered until April 9, 2018, when it learned of her disability through the lawsuit. On that same day, HR reached out to Wrenn (who had been on leave for nearly a year) in an attempt to determine whether it could identify any reasonable accommodations that would permit Wrenn to perform the essential functions of her job. Dkt. 94, ¶ 71. Wrenn did not respond to this, or any of ExGen's other attempts to have an interactive process. ExGen even explained the importance of her participation in the process: "Your cooperation in the interactive process is essential so that we can determine the need . . . and evaluate possible modifications or adjustments that would allow you to perform the essential

---

[6] Indeed, even when viewed in Wrenn's favor, the facts show extraordinary efforts by ExGen to accommodate her concerns about Zura as soon as it learned of his actions.

functions of the position you held prior to taking leave or some other available position for which you are qualified." *Id.* ¶ 72. This is reasonable conduct by an employer that just learned about an employee's disability. Wrenn, however, argues that HR understood she was requesting an accommodation for her disability nine months earlier, on August 16, 2017, when she raised concerns about "her ability to perform her duties if Zura was on site." Dkt. 101, at 10-11. That is simply not a reasonable inference of the facts. *See Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 459 (7th Cir. 1999). (only reasonable inferences need be drawn in non-movant's favor). The only reasonable inference from the facts is that ExGen was viewing the circumstances through a sexual harassment lens, not a disability lens. And it would be unreasonable for ExGen to view the circumstances otherwise.

Even if the duty to provide a reasonable accommodation were triggered much earlier than the lawsuit, say, when Wrenn first raised concerns about Zura's stalking to HR, when she got sick and went home after encountering Zura, or when she obtained the SNCO, ExGen argues that its efforts to accommodate were reasonable. The Court agrees. ExGen took considerable steps to prevent Zura from coming into contact with Wrenn at work, such as switching crews, assigning different turnover locations, modifying turnover procedures, and requiring Zura to remove himself if he ever happened to be in the same room as Wrenn. They explored transferring him to an entirely different location, but Zura did not agree to that because he would be giving up earned seniority under the CBA. When Zura took the day shift for the outage, like he always did, and Wrenn chose the day shift knowing he was on it, despite previously preferring the night shift, ExGen took further steps to adjust their procedures so that Wrenn would not come into contact with him. Wrenn further argues that ExGen did not include her in any decisions about how to accommodate her so that she would not come into contact with Zura, but the facts show

that when ExGen did include her and ask what she wanted, she said "when I'm here, he's not" or she did not respond at all. The first is a legal non-starter; the latter scotches her claim.

An accommodation is unreasonable if it requires the employer to terminate another employee. *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 526 (7th Cir. 1996). And a disabled employee is not necessarily entitled to her preferred accommodation—just a reasonable one. *Schmidt v. Methodist Hosp. of Indiana*, 89 F.3d 342, 344 (7th Cir. 1996). Here, the only accommodation that Wrenn would accept was a guarantee that Zura would not be present on site when she was. As a matter of law, this is unreasonable. *Weiler*, 101 F.3d at 526; *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996); *see also Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001).

Further, Wrenn's preferred accommodation would require ExGen to violate the terms of its CBA with the Union because of the way it would impact Zura's earned seniority. Generally, an employer is not required to provide a reasonable accommodation at an employee's request when "doing so would conflict with the seniority rights of other employees." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 403 (2002) (holding that "collectively bargained seniority trumps the need for reasonable accommodation" absent special circumstances, such as a seniority system that changes so frequently there is no expectation of seniority-based treatment or a system with so many exceptions that another won't matter). Here, that is exactly what Wrenn is asking ExGen to do: She wants his schedule changed, him transferred to a different facility, or him terminated. These requests are not "reasonable accommodations" because they conflict with Zura's seniority rights under the CBA. Although Wrenn argues that the present case is a special circumstance under *Barnett* because Zura is "not an innocent, third-party co-worker whose seniority would be compromised," Wrenn cited no case law to support this attempt at an unclean

hands style exception and the Court was unable to locate any support either. The fact that Zura's stalking triggered Wrenn's PTSD has no bearing on whether rights under the ADA can trump a collectively-bargained agreement. Wrenn's argument is unpersuasive, and therefore, Wrenn cannot state a *prima facie* case for failure to accommodate because she has not shown that ExGen had notice of her disability or that it failed to accommodate her once its duty was triggered.

Thus, ExGen's motion for summary judgment as to the ADA claim is granted.

## B. Title VII Sex Discrimination

Wrenn alleges that ExGen discriminated against her based on her sex when it treated Zura, a male employee, more favorably when it came to fitness-for-duty reviews. ExGen argues that it is entitled to summary judgment on the Title VII claim because Wrenn can neither establish a *prima facie* case nor pretext. For the reasons below, ExGen's summary judgment motion as to the Title VII claim is granted.

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an employee on the basis of sex. 42 U.S.C. § 2000e-2(a)(1). An employer violates this section of Title VII when "discrimination based on sex ... create[s] a hostile or abusive work environment." *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 624 (7th Cir. 2018) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986)). A hostile work environment claim requires plaintiffs to show that they were (1) subjected to unwelcome sexual conduct, advances, or requests; (2) because of their sex; (3) that were severe or pervasive enough to create a hostile work environment; and (4) that there is a basis for employer liability. *Costco*, 903 F.3d at 625. Here, however, the operative complaint does not contain a hostile work environment claim. *See* dkt. 38. In fact, Judge Kapala dismissed Wrenn's hostile work environment claim in March

2019. *See* dkt. 37, at 5. And Wrenn never repleaded the claim despite Judge Kapala giving leave to do so. Dkt. 37, at 8, 14.

Even without a hostile work environment claim, a plaintiff may allege that an employer's conduct was merely a pretext to its employment discrimination based on sex. The Seventh Circuit looks to the *McDonnell Douglas* burden-shifting analysis for claims of employment discrimination under Title VII.[7] *Kuttner v. Zaruba*, 819 F.3d 970, 976 (7th Cir. 2016). To establish a prima facie case, plaintiffs must establish the following:

(1) they are a member of a protected class;
(2) they met their employer's legitimate job expectations;
(3) they suffered an adverse employment action; and
(4) similarly situated employees outside of the protected class received more favorable treatment.

*Id.* (citing *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012)). On summary judgment, the central question at issue is whether the employer acted on account of the plaintiff's sex. *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013). Put another way, "[h]as the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

### 1. Adverse employment action

Wrenn claims she was intentionally discriminated against based on her sex when ExGen withdrew her access, placed her on a medical leave of absence, and required an evaluation before

---

[7] The Seventh Circuit recognizes alternative ways to establish this, but because the parties here use the language of *McDonnell Douglas*, this Court will follow that approach. Under *Perez*, for example, a plaintiff needs to show that "(a) the employer's nondiscriminatory reason was dishonest; and (b) the employer's true reason was based upon a discriminatory intent." *Perez v. Illinois*, 488 F.3d 773, 777 (7th Cir. 2007). "The *question* is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason . . ." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). Ultimately, "courts must evaluate all evidence together as a whole, whatever the source." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 766 (7th Cir. 2016).

she returned to work—and did not require the same of Zura after she obtained the SNCO. Dkt. 95, at 12. As best as the Court can understand Wrenn's argument, collectively this amounted to a "constructive discharge" and established an adverse employment action. Dkt. 101, at 2. She alleges that Zura was similarly situated but treated differently. Dkt. 95, at 12-13.

According to ExGen's Statement of Facts (which are deemed admitted because Wrenn did not respond with her own) while ExGen was conducting an investigation into Zura's conduct, Wrenn was so distracted at seeing him on site, she became sick to her stomach, threw up, and went home—of her own volition. Dkt. 94, ¶ 25. Wrenn subsequently called in sick, and she remained on a medical leave of absence though August 2017. *Id.* ¶ 27. After a brief return to work, Wrenn took a second medical leave in September 2017, and she was ultimately "terminated" after she failed to report to work in December 2018 or sign up for supplemental disability benefits. *Id.* ¶¶ 66, 76. This "termination" in March 2019 was a mere formality for the employer and is not part of Wrenn's claims. Wrenn specifically argues that the "forced" medical leave and unwillingness to accommodate her, a stalking victim—while simultaneously accommodating Zura, her stalker—was ExGen's conduct in violation of Title VII. *See* dkt. 101, at 2. But ExGen argues that Wrenn did not suffer an "adverse employment action" when she took medical and disability leave of her own volition and failed to return to work. Dkt. 106, at 12.

The Seventh Circuit specifically recognizes three types of adverse employment actions:

(1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination;

(2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and

(3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way

> that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

*Dass v. Chicago Bd. of Educ.*, 675 F.3d 1060, 1069 (7th Cir. 2012) (internal citations omitted). "Typically, adverse employment actions are economic injuries." *Markel v. Board of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911 (7th Cir. 2002). "The adverse action must materially alter the terms and conditions of employment." *Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001). But the terms and conditions of Wrenn's employment were not materially altered; if anything, they were improved when ExGen arranged for Zura to avoid Wrenn. Although Wrenn only received eighty percent of her base salary during her medical leave, the fact remains that she voluntarily took it. Every employee who opts to take a medical or disability leave and receives reduced compensation—or even no compensation—cannot claim an adverse employment action by their employer. That is simply not the way it works. "Working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because in the ordinary case, an employee is expected to remain employed while seeking redress." *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000).

Here, Wrenn's hostile work environment claim was dismissed and not replead. *See* dkt. 37, at 8, 14. Because she "failed to show work conditions so egregious as to meet the stringent hostile work environment standard, she certainly cannot reach the even higher threshold required to show a constructive discharge." *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 649 (7th Cir. 2005). Wrenn has not shown that her work environment was "so hostile that she was 'forced to take unpaid leave.'" *Costco*, 903 F.3d at 629 (quoting *Townsend v. Indiana Univ.*, 995 F.2d 691, 693 (7th Cir. 1993). And, because the Court finds no failure to accommodate, *see infra*, Section A.2., Wrenn's argument that she was forced to go on leave is again unpersuasive. *See Timmons v. General Motors Corp.*, 469 F.3d 1122, 1128 (7th Cir. 2006) (holding that an employer's failure to

accommodate an employee's disability, thus forcing the employee to go on an involuntary medical leave, was an adverse employment action). Although a termination is the quintessential adverse employment action, *see Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998), an employee's choice to take a reduction in pay in conjunction with a medical leave of absence is not. Nor is an employer's processing a termination months after the employee failed to return to work. Wrenn resigned, looked for new employment, and started another job; she cannot show that she was constructively discharged or that her medical leave was an adverse employment action.[8]

### 2. Similarly situated employees

The Seventh Circuit looks to similarly situated employees to "eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable — discriminatory animus." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (internal citations omitted). "While similarly situated parties need not be 'identical in every conceivable way,' they 'must be directly comparable to the plaintiff in all material respects.'" *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 719 (7th Cir. 2021) (quoting *Coleman*, 667 F.3d at 846.). "All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination. The 'similarly situated' prong establishes whether all things are in fact equal." *Filar v. Bd. of Educ. of City of Chicago*, 526 F.3d 1054, 1061 (7th Cir. 2008).

The only other employee Wrenn offers for comparison is Zura. After Wrenn reported his conduct to HR (but before Wrenn obtained the SNCO against him), ExGen moved Zura to

---

[8] The Court resolves this issue without considering whether *U.S. Dep't of Navy v. Egan*, 484 U.S. 518 (1998), precludes a court from second-guessing a determination of fitness for duty.

another crew and disciplined him as a result of violating ExGen's Policy Against Harassment. Dkt. 94, ¶¶ 28-30. ExGen did not find him unfit for duty at this time. Dkt. 106, 12. As a result of their investigation and Wrenn's obtaining the SNCO, ExGen modified Zura's work schedule and created procedures if their schedules overlapped. Dkt. 94, ¶ 37. Also, ExGen worked with the Union to consider transferring Zura to a different facility, which ultimately did not happen. *Id.* ¶ 39. And when Wrenn chose to work the same day shift as Zura during the outage period, ExGen arranged for Zura to perform tasks that kept him separate from Wrenn, including attending shift turnover telephonically from a separate location. *Id.* ¶ 53.

Although Wrenn alleges that Zura was similarly situated to her, ExGen argues that they were not because Wrenn admitted she was not fit-for-duty, chose to take a medical leave, and remained off work—while Zura did not. Dkt. 95, at 13. Wrenn has not shown that they were similarly situated or sufficiently analogous. A similarly situated employee who is not in Wrenn's protected class, *i.e.*, of the female sex, would be a male employee who struggled with anxiety or similar illness and was treated better. Or even a male employee who did not get along with another ExGen employee and needed to be kept separate and was somehow even further separated from the harasser. But Wrenn does not offer these comparators; rather, she only offers Zura, who shares more dissimilarities with her than similarities.

ExGen admits, however, there may have been a time when Wrenn and Zura were similarly situated, *i.e.*, when Zura self-reported that he was not fit-for-duty after this lawsuit was filed. But ExGen has shown they were treated identically during that time. Dkt. 106, at 2. Wrenn took a sixty-week leave of absence and was terminated when she did not return to work. Zura, who had more seniority, took a leave of absence, returned to work after 17 weeks off, then

retired four months later. As Nuclear Equipment Operators, neither of them was allowed to return to work until they were deemed fit-for-duty. Dkt. 94, ¶ 70.

Zura is not "directly comparable" to Wrenn "in all material respects," and thus Wrenn has failed to show that similarly situated employees were treated differently than she was. And further, even if Wrenn was able to establish a *prima facie* case of sex discrimination, she has not proffered any evidence to support a reasonable inference of pretext. Therefore, ExGen's motion for summary judgment as to the Title VII claim is granted.

### C. Lost Wages

Finally, ExGen argues that Wrenn is not entitled to lost wages. Dkt. 95, at 14. The court agrees. Plaintiffs who leave their employment must establish discriminatory discharge or a hostile work environment to be eligible for damages in the form of lost wages. *Costco*, 903 F.3d at 628. "[A] mere causal link between the discrimination and the change in employment status is insufficient. The victim of the harassment must establish that her working conditions were so objectively intolerable that they forced a change in employment status—here, from regular employment to unpaid leave." *Id.* at 629. Because the Court finds that no reasonable jury could return a verdict for Wrenn under either the ADA or Title VII, she is not entitled to lost wages or backpay.

The following facts are uncontested. Wrenn chose to take medical leave, and ExGen made multiple attempts to accommodate and facilitate her return to work, but she rebuffed her employer and eschewed each opportunity—even after Zura retired and ExGen could guarantee that Zura would not be there when she was. Wrenn admits she knew that she would be terminated if she did not return to work, and, in fact, she admits to applying for and starting another job before she was formally "terminated" from ExGen. Dkt. 94, ¶¶ 76, 78. The Court is

unclear the extent to which ExGen is arguing that Wrenn has no claim to lost wages because she was not constructively discharged. *See* discussion *supra* at B.1. But to be clear, Wrenn was not terminated. She quit.

For the above reasons, Wrenn is not entitled to lost wages.

### D. Motion to Strike Declaration of Kyle Kramer

Wrenn's motion to strike the declaration of Kyle Kramer is denied. Kramer, who is ExGen's Senior Access Authorization Reviewer in ExGen's Access Authorization and Fitness for Duty Department, was not identified as a potential witness in ExGen's Rule 26(a) disclosures or supplements. "Under Rule 37(c)(1), the exclusion of non-disclosed evidence is automatic and mandatory . . . unless non-disclosure was justified or harmless." *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012) (quoting *Musser v. Gentiva Health Svcs.*, 356 F.3d 751, 758 (7th Cir. 2004)). When evaluating whether a party's non-disclosure was harmless, courts consider, among other factors: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date. *Tribble*, 670 F.3d at 760. Although ExGen uses Kramer's declaration to materially support its Title VII defense that it treated both employees the same when it came to fitness-for-duty reviews, its use is harmless because that evidence was already in the record through other depositions and was thus neither a surprise nor prejudicial to Wrenn. The evidence offered by Kramer was cumulative of evidence already in the record. It appears as though ExGen's purpose in submitting this declaration was to identify the name of the individual who actually performed the fitness-for-duty review. Knowing the name of this employee is unnecessary to deciding the issue, and

therefore, the non-disclosure is harmless. *See* Fed. R. Civ. P. 37(c)(1). Wrenn's motion to strike is denied.

**CONCLUSION**

For the above reasons, the defendant's motion for summary judgment [93] is granted, and the plaintiff's motion to strike [102] is denied.


Date:  June 2, 2021    By: _____
              IAIN D. JOHNSTON
              United States District Judge